UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------x
BANKUNITED, N.A.,

                                        Plaintiff,

                - against -                                    **OPINION AND ORDER**

                                                              17-CV-5268 (CS)
MERRITT ENVIRONMENTAL CONSULTING
CORP.; LENDER CONSULTING SERVICES, INC.;
GREAT DIVIDE INSURANCE COMPANY; BEAZLEY
USA SERVICES, INC. a/k/a SYNDICATE 2623/623 AT LLOYD'S;
and CRUM & FORSTER SPECIALTY
INSURANCE COMPANY,
                                        Defendants.
--------------------------------------------------------------------------x

<u>Appearances</u>:

Joseph C. Savino
Lazer, Aptheker, Rosella & Yedid, P.C.
Melville, New York
*Counsel for Plaintiff*

Peter Basil Skelos
Danielle B. Gatto
Forchelli Deegan Terrana, LLP
Uniondale, New York
*Counsel for Defendant Merritt Environmental Consulting Corp.*

Jeffrey C. Stravino
Hodgson Russ LLP
Buffalo, New York
*Counsel for Defendant Lender Consulting Services, Inc.*

Dennis M. Wade
Michael A. Gauvin
Wade Clark Mulcahy, LLP
New York, New York
*Counsel for Defendant Great Divide Insurance Company*

Stephen J. Steinlight
Troutman Sanders LLP
Irvine, California
Matthew J. Aaronson
Kevin F. Kieffer
Troutman Sanders LLP
New York, New York
*Counsel for Defendant Beazley U.S.A. Services, Inc. a/k/a Syndicate 2623/623 at Lloyd's*

Gary S. Kull
Alexa J. Nasta Schmid
Kennedys CMK LLP
Basking Ridge, New Jersey
*Counsel for Defendant Crum & Forster Specialty Insurance Company*

<u>Seibel, J.</u>

## I.   BACKGROUND

I accept as true the facts, but not the conclusions or legal arguments, set forth in the

Amended Complaint.  (Doc. 29 ("AC").)

### A.   Facts

1.   <u>The Parties</u>

This case involves a dispute among a mortgage loan underwriter, BankUnited, N.A

("BankUnited" or "Plaintiff"); two environmental consulting companies, Merritt Environmental

Consulting Corp. ("MECC") and Lender Consulting Services, Inc. ("LCS"); and three insurance

providers, Great Divide Insurance Company ("Great Divide"), Beazley USA Services, Inc. a/k/a

Syndicate 2623/623 at Lloyd's ("Beazley"), and Crum & Forster Specialty Insurance Company

("Crum").

2.   <u>The Environmental Site Assessment and Review</u>

On July 17, 2013, Plaintiff and MECC executed a Master Services Agreement for

Environmental Consulting Services (the "MMSA") for MECC to "provide environmental

consulting services to BankUnited at certain designated sites to assist BankUnited in the underwriting of mortgage loans." (AC ¶ 17.) The same day, Plaintiff and LCS entered into a Master Services Agreement for Environmental Consulting Services (the "LMSA") for LCS to also provide environmental consulting services to assist Plaintiff in underwriting mortgage loans. (*See id.* ¶ 89.)

In 2013, Mt. Kisco Associates LLC (the "Borrower") requested a loan from Plaintiff to refinance its mortgage on property located at 105 Kisco Avenue, Mount Kisco, New York 10549 (the "Premises"). (*Id.* ¶ 19.) On November 5, 2013, to assess whether it should underwrite the loan, Plaintiff issued MECC a work order pursuant to the MMSA, requesting a Phase I Environmental Site Assessment ("ESA") "to assess the environmental risk of the Premises." (*Id.* ¶ 21.) MECC's obligations to Plaintiff under the MMSA and work order included the duty to perform services "in a manner consistent with that level of care and skill ordinarily exercised by other professional consultants under similar circumstances at the time the Services are performed." (*Id.* ¶ 27; *id.* Ex. A art. IV.)

MECC conducted the ESA on November 18, 2013, and subsequently delivered a Phase I Report completed by MECC's President, Charles G. Merritt, and John Perotti. (*See id.* ¶¶ 22-23, 96.) At the time the report was prepared, Merritt had nineteen years of industry experience and Perotti had over twenty years of experience performing environmental site assessments for lending institutions. (*Id.* ¶¶ 97, 99.) Plaintiff alleges that, on information and belief, neither Merritt nor Perotti hold an engineering degree or are licensed engineers. (*Id.* ¶¶ 105-106.)

The report stated that Perotti investigated "the ground floor, second floor, utilities areas, warehouse, retail space, side paved parking lots, and all accessible exterior areas of the Premises." (*Id.* ¶ 23.) The report concluded:

Based on historical Sanborn fire insurance maps, the subject property has historically been occupied by a lumber mill, a garage, a painting shop, coal and wood sheds, an auto sales/service facility, and a woodworking facility. Without the benefit of a subsurface investigation we cannot determine if any contamination is present or if a Potential Vapor Encroachment Condition (PVEC) exists from the form [*sic*] site usage[;] (2) Historical Sanborn maps from 1916 to 1949 depict a 250-gallon gasoline tank associated with the subject property buried beneath Kisco Avenue. In addition, the 1916 map depicts the northeast portion of the subject property to contain a Standard Oil Company oil tank approximately 20 feet in diameter. Further evaluation is recommended to determine whether documentation regarding these tanks is available or if additional investigation (Phase II) is warranted.

(*Id.* ¶ 24 (alteration in original).)

On March 4, 2014, pursuant to the LSMA, LCS reviewed the Phase 1 Report that MECC had prepared. (*Id.* ¶ 89.) LCS found that MECC's Phase I Report met the applicable professional standards as set forth by the American Section of the International Association for Testing Materials ("ASTM"). (*Id.* ¶ 90; *see id.* ¶ 71.) Julie A. Daly, senior vice president at LCS, conducted the review and at the time had over ten years of relevant full-time experience. (*Id.* ¶ 101.) Plaintiff alleges that, on information and belief, Daly does not hold an engineering degree and is not a licensed engineer. (*Id.* ¶ 107.)

Plaintiff hired MECC to conduct the ESA and LCS to review the ESA as part of Plaintiff's due diligence to attain "innocent landowner" status under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601, *et seq.*, before obtaining a security interest in the Premises.[1] (*Id.* ¶¶ 21, 89, 94.) To obtain innocent landowner status, Plaintiff was required to commission an environmental site assessment from an

---

[1] Under CERCLA, landowners are held liable for, among other things, the cost of removal and damages arising out of hazardous material on their land. 42 U.S.C. § 9607(a). If, however, the release or threat of release of hazardous substances was due to the fault of a third party, and the landowner executed reasonable care and took precautions against the foreseeable acts or omissions of the third party, then the landowner is innocent and not liable. *See id.* §§ 9601(35)(A), 9607(b)(3).

"Environmental Professional" as defined by CERCLA, and Plaintiff states MECC and LCS met that definition. (*Id.* ¶¶ 94-95.)

Relying on MECC's Phase I Report and LCS's review, as well as a November 21, 2013 appraisal of the Premises by Cushman & Wakefield of Connecticut, Inc., which determined that the as-is market value of the Premises was $4,300,000, Plaintiff loaned $3,225,000 to the Borrower on March 20, 2014, with the Premises mortgaged as security for repayment. (*Id.* ¶¶ 25-26, 93.) Unbeknownst to Plaintiff, however, the Premises had a history of nuclear and radiological contamination that was not included in the ESA or caught by LCS's review. (*See id.* ¶ 28).

    3. <u>History of the Premises</u>

Historical records from 1942 show that the Canadian Radium and Uranium Corporation ("Canrad") operated a nuclear refinery that was partially located on the Premises. (*Id.* ¶ 29.) During and just prior to the United States's involvement in World War II, the United States delivered "uranium sludge" to Canrad, and Canrad extracted from the sludge numerous highly radioactive substances, including radium, radium-D, polonium, and actinium. (*Id.* ¶¶ 31-33). Canrad's "hasty" production process due to the wartime emergency led to radiological contamination throughout the Premises. (*Id.* ¶¶ 29,34.)

After World War II, Canrad ceased producing weaponized uranium, but still produced commercial quality radium and uranium in its refinery. (*Id.* ¶ 35.) Government inspections of the refinery found "deplorable conditions" and continuous overexposure to radiation. (*Id.* ¶¶ 36-37.) In 1957, New York State brought charges against Canrad for exposing its employees to excess radiation, and Canrad pleaded guilty. (*Id.* ¶ 38.) In 1958, Canrad was ordered by the

New York State Department of Health to dispose of the radioactive waste at its refinery, and, despite Canrad's efforts to comply, it failed to decontaminate the Premises.  (*Id.* ¶¶ 39-40.)

In 1966, the Mt. Kisco Urban Renewal Agency bought the Premises, as well as adjoining land, with the goal of decontaminating it.  (*Id.* ¶ 41.)  The attempts to decontaminate, however, resulted in further contamination.  (*Id.* ¶¶ 43-44.)  From the 1970s onward, local, state, and federal agencies investigated, discovered, and reported on harmful contaminants existing at the Premises, including in a 1980 Westchester County report, a 1993 State Department of Health survey, a 1994 Environmental Protection Agency ("EPA") investigation, and a 1998 State Department of Environmental Conservation report.  (*Id.* ¶¶ 47-53.)  Then, in 2013, the EPA again decided to investigate the Premises, conducting on-site reconnaissance and gamma radiation screening, and found radionuclide contamination.  (*Id.* ¶¶ 54-55.)

On June 22, 2015, the EPA and New York State agencies met with the Borrower to discuss the contamination of the premises, and the EPA stated its intention to order a cleanup. (*Id.* ¶ 56.)  In August 2015, the EPA commissioned Weston Solutions, Inc. ("Weston") to conduct a radiological survey ("the 2015 EPA report"), and Weston found above-background gamma readings, radioactive radium above EPA Site-Specific Action Levels ("SSALs"), and radon levels in excess of EPA SSALs inside and premises and in the soil.  (*Id.* ¶¶ 57-59.)  In April 2016, the EPA commissioned Weston to conduct a Phase II Removal Assessment Report, and the Report concluded there was gamma radiation more than triple background levels near a warehouse on the Premises and several "hotspots" more than double background levels.  (*Id.* ¶¶ 62-63.)  Radioactive radium was also detected.  (*Id.* ¶ 64.)  Further, Weston took groundwater samples at the Premises and found alpha and beta particles, radium, bismuth, lead, and thallium, all exceeding EPA SSALs.  (*Id.* ¶¶ 66-67.)

#### 4. MECC's and LCS's Failure to Report on the Contamination

Plaintiff hired MECC to perform the ESA "for the purpose of uncovering '[the] presence or likely presence of any hazardous substances . . . on [the] property that indicate an existing release, a past release, or a material threat of a release of any hazardous substance . . . into structures on the property or into the ground, groundwater, or surface water of the property,'" (*id.* ¶ 68, Ex. C at 2)) (alterations in original), but MECC failed to discover, disclose, or detect the radioactive contamination at the Premises, (*id.* ¶¶ 68-69). MECC also failed to conduct the ESA in accordance with the applicable professional standards set forth in the ASTM. (*Id.* ¶ 71.) For example, ATSM E 1527-05 requires, among other things, interviews with multiple individuals, including state and local officials, to determine past uses of the property and whether hazardous substances are within or likely to migrate onto the property. (*Id.* ¶ 72.) MECC failed to conduct such interviews, which resulted in a defective and misleading Phase I Report. (*Id.* ¶¶ 73, 75.) As such, Plaintiff was not aware and could not have been aware of the radiological or nuclear contamination. (*See id.* ¶ 82.) "MECC's failure to conduct the ESA with the skill ordinarily exercised by professional environmental consultants at the time of the ESA resulted in an error-filled and materially misleading Phase I Report." (*Id.* ¶ 86.)

Similarly, LCS failed to review MECC's Phase I Report in accordance with ASTM standards. (*Id.* ¶ 90.) LCS's review did not mention MECC's failure to interview local and state officials or MECC's failure to follow up on the radiological risk posed by Canrad's adjacent site. (*Id.* ¶ 91.)

#### 5. Events After Plaintiff Learned of the Contamination

On November 16, 2015, the Borrower notified Plaintiff that the EPA was investigating the Premises. (*Id.* ¶ 61.) The Borrower also explained that it had filed an action on July 9, 2015,

asserting multiple claims against multiple defendants, including MECC. (*Id.*; *see 105 Mt. Kisco Assocs. LLC v. Carozza*, No. 15-CV-5346 (S.D.N.Y. July 9, 2015)).

On March 3, 2016, the *Journal News* published an article titled, "Atomic Legacy Fuels Lawsuit over Mount Kisco Property," detailing the Borrower's lawsuit. (AC ¶¶ 160, 162). This was, upon information and belief, the first article published in a periodical and made known to the general public directly linking the Premises to the Canrad refinery. (*Id.* ¶ 162.) Several other news articles were subsequently published regarding the history of contamination on the Premises and the Borrower's lawsuit. (*Id.* ¶¶ 163-164.)

On or about September 9, 2016, the Borrower hired a consultant who estimated the cost of remediating the nuclear and radiological contamination on the Premises to range from $4 million to $30 million. (*Id.* ¶¶ 153-154.) Additionally, the Borrower's tenant, NY Stone, discontinued its business following the 2015 EPA report. (*Id.* ¶ 155.) Plaintiff alleges on information and belief that the Borrower's inability to derive income from its tenant due to the contamination on the Premises made it unable to perform under the terms of the loan, (*id.* ¶ 156), and on or about December 10, 2016, the Borrower defaulted by failing to make payment, (*id.* ¶ 151). The Borrower is in default in the amount of $3,043,251.70. (*Id.* ¶ 157.)

Because of the high cost of remediating the contamination on the Premises, Plaintiff realized that foreclosure was no longer a viable method of enforcing the note, so Plaintiff entered into a forbearance agreement with the Borrower on May 9, 2017, agreeing to accept payments of interest only while Plaintiff pursued its claims against the Defendants. (*Id.* ¶ 158.) Pursuant to the forbearance agreement, the Borrower paid Plaintiff $68,288.88 in arrearage at closing, and Plaintiff has forgone approximately $38,700.00 in principal installment payments, as well as its rights to the accelerated sum of $3,043,251.70. (*Id.* ¶ 159.)

On October 18, 2017, Plaintiff commissioned another appraisal of the Premises by Cushman & Wakefield of Connecticut, Inc., which, on October 24, 2017, stated that the Premises was worth nothing. (*Id.* ¶¶ 165-166.)

6.    <u>The Insurance Contracts and Insurers' Denial of Coverage</u>

The MMSA and the LMSA both contained insurance clauses requiring MECC and LCS to insure and protect Plaintiff against the risk of loss caused by the services that Plaintiff hired MECC and LCS to perform. (*Id.* ¶¶ 112, 137.) Under the MMSA, MECC was required to maintain "Comprehensive General Liability Insurance in a per occurrence basis in an amount of not less than $1,000,000 with an aggregate of $2,000,000 and $50,000 fire damage," and "Professional Errors and Omissions coverage in a claims made basis for an amount of not less than $1,000,000 per claim with an aggregate of $1,000,000." (*Id.* ¶¶ 109-110, Ex. A art. VI.) The MMSA also stated that, "Except for the Errors and Omissions and workers compensation policies, BankUnited, N.A. shall be listed as an additional insured." (*Id.* ¶ 111, Ex. A art. VI.) The LMSA required LCS to procure the same insurance that the MMSA required MECC to procure. (*Id.* ¶¶ 134-136.)

From April 17, 2013, to April 17, 2014, MECC held a Commercial Lines Policy ("Policy 7425") from Defendant Great Divide, which included defense and indemnification coverage for property damage liability, contractors pollution liability, and professional liability. (*Id.* ¶ 113.) MECC renewed Policy 7425 through April 17, 2016. (*Id.*) Policy 7425 included an additional insured endorsement providing coverage for general liability and contractors pollution liability, and included "any persons or organizations when [MECC] and such persons or organizations have agreed in a written contract or written agreement that such persons or organizations be added as an additional insured on your policy." (*Id.* ¶ 114, Ex. G at 39.)

Beginning April 17, 2016, and through the filing of the AC, MECC held an insurance policy from Defendant Beazley ("Policy 0201"), which included defense and indemnification coverage for property damage liability, contractors pollution liability, and professional liability. (*Id.* ¶ 117.) Policy 0201 had an additional insured endorsement that covered general liability and contractors pollution liability, and included "the client for whom [MECC] performs or performed contracting services . . . provided that a written contract or agreement is in effect between the [MECC] and the client requiring the client to be an additional insured under [MECC]'s general liability and/or contractors pollution liability policy." (*Id.* ¶ 118, Ex. H at 31-32.) Further, from April 17, 2017, through the filing of the AC, MECC held an umbrella insurance policy with Beazley ("Policy 0101"), which included indemnification coverage for liability in excess of the aggregate limit of Policy 0201 and umbrella liability coverage. (*Id.* ¶ 121.)

From July 6, 2013, to July 6, 2014, LCS held an Environmental Package Policy ("Policy 1563") from Defendant Crum, which included defense and indemnification coverage for property damage liability, contractors pollution liability, and professional liability. (*Id.* ¶ 142.) Policy 1563 included an additional insured endorsement that covered general liability and contractors pollution liability, and included those persons or organizations "required by contract." (*Id.* ¶ 143, Ex. K at 63.) From July 6, 2017 to July 6, 2018, LCS held a Commercial Lines Policy ("Policy 2189") from Defendant Great Divide, which included defense and indemnification coverage for property damage liability, contractors pollution liability, and professional liability. (*Id.* ¶ 138.) Policy 2189 included an additional insured endorsement providing coverage for general liability and contractors pollution liability, and included "any persons or organizations when [LCS] and such persons or organizations have agreed in a written

contract or written agreement that such persons or organizations be added as an additional insured on your policy." (*Id.* ¶ 139, Ex. J at 40.)

Great Divide denied any coverage to MECC under Policy 7425, citing a pollution exclusion, a radioactive matter exclusion, and a professional services exclusion, (*id.* ¶¶ 125-130), and denied any coverage to LCS under Policy 2189, citing the same exclusions, that LCS's work predated the policy period, and a "known conditions" clause, (*id.* ¶¶ 147-148). Beazley denied coverage to MECC under Policy 0201, citing a prior claims provision and a prior knowledge exclusion, and denied coverage under Policy 0101, alleging that Policy 0201 must be exhausted first. (*Id* ¶¶ 132-133.) Crum denied coverage to LCS under Policy 1563, citing that the claim was outside the policy period and Plaintiff was not an additional insured. (*Id.* ¶ 150.)

### B. Procedural History

On July 13, 2017, Plaintiff filed a complaint against MECC, LCS, and Great Divide. (Doc. 1.) On October 16, 2017, this Court held a conference, and Plaintiff was granted leave to amend its complaint. (Minute Entry dated Oct. 16, 2017.) On November 16, 2017, Plaintiff filed the AC, adding Beazley and Crum as Defendants. (*See* AC.) In the AC, Plaintiff asserted the following claims: (1) breach of contract against MECC, (2) professional malpractice against MECC, (3) negligent misrepresentation against MECC, (4) breach of contract against LCS, (5) professional malpractice against LCS, (6) negligent misrepresentation against LCS, (7) declaratory action against Great Divide for insurance coverage under Policy 7425, (8) declaratory action against Beazley for insurance coverage under Policy 0201, (9) declaratory action against Beazley for insurance coverage under Policy 0101, (10) declaratory action against

Great Divide for insurance coverage under Policy 2189, and (11) declaratory action against Crum for insurance coverage under Policy 1563.  (*See id.* ¶¶ 168-316).[2]

Defendants Great Divide, MECC, LCS, and Beazley each filed a motion to dismiss, (Docs. 67, 76, 81, 93), and a memorandum of law in support of their motions, (Docs. 78 ("MECC Mem."), 82 ("LCS Mem."), 87, 95).  Plaintiff opposed each motion, (Docs. 86 ("Opp. to LCS"), 90, 92 ("Opp. to MECC"), 97), and the four Defendants replied to Plaintiff's opposition, (Docs. 73, 80 ("MECC Rep."), 88 ("LCS Rep."), 98).  Additionally, on September 14, 2018, Crum moved for judgment on the pleadings, (Doc. 112), and filed a memorandum of law in support, (Doc. 113).  Plaintiff opposed Crum's motion on October 19, (Doc. 115), and Crum replied on November 14, (Doc. 116).

## II.    LEGAL STANDARDS

### A.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks

---

[2] The breach of contract claims allege that MECC and LCS failed to perform up to professional standards and that they failed to maintain the contractually required insurance.

omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

The standard for assessing a motion for judgment on the pleadings pursuant to Rule 12(c) is the same as that for a Rule 12(b)(6) motion to dismiss. *See Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001); *Accelecare Wound Ctrs., Inc. v. Bank of N.Y.*, No. 08-CV-8351, 2009 WL 2460987, at *4 (S.D.N.Y. Aug. 11, 2009).

### B.    Documents the Court May Consider

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . , and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted). To be incorporated by reference, the complaint must make "a clear, definite and

substantial reference to the documents." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (internal quotation marks omitted). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (alteration in original) (citation and internal quotation marks omitted).

Here, Plaintiff attached as exhibits to the complaint, among other things, the MMSA, the LSMA, and all of the insurance policies, (AC Exs. A, E, G-K), and they therefore they may be considered on this motion to dismiss. Declarations and affidavits submitted in support of a motion to dismiss, however, "are generally properly used only to describe the documents attached to them as exhibits for the Court's consideration, not to advance factual averments or legal arguments." *Clark v. Kitt*, No. 12-CV-8061, 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014) (citation omitted), *aff'd*, 619 F. App'x 34 (2d Cir. 2015) (summary order). Charles G. Merritt's declaration in support of MECC's motion to dismiss, (Doc. 77), includes factual averments that I will not consider. Christina S. Remolina's affidavit in support of Great Divide's motion to dismiss, (Doc. 83), summarizes some of the factual background of the case and the legal arguments presented in Defendant's brief, so I will not consider the affidavit except to the extent it attaches and describes exhibits, *see HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881, 2012 WL 4477552, at *5 (S.D.N.Y. Sept. 27, 2012) (collecting cases). The affidavit of Daryl Gottilla in support of Great Divide's motion to dismiss, (Doc. 84), and the declaration of Stephen J. Steinlight in support of Beazley's motion to dismiss, (Doc. 94), permissibly describe the exhibits attached to them, but those exhibits have no effect on the outcome of the instant motions and thus I need not discuss them further.

## III.    DISCUSSION

### A.    Statute of Limitations as Applied to Claims Against MECC and LCS

"Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York . . . statutes of limitations." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998).  Under New York law, breach of contract actions are subject to a six-year statute of limitations.  N.Y. C.P.L.R. § 213(1)-(2).  Actions for professional malpractice, "regardless of whether the underlying theory is based in contract or tort," are subject to a three-year statute of limitations.  *Id.* § 214(6).  Claims of negligent misrepresentation are "subject to a three-year limitations period, unless the claim is grounded upon essential allegations of actual or constructive fraud, in which case the claim is governed by a six-year limitations period." *N.Y. State Workers' Comp. Bd. v. Comp. Risk Managers, LLC*, 67 N.Y.S.3d 792, 802 (Sup. Ct. 2017).

### 1.    Professionals Under CPLR § 214(6)

While breach of contract claims are generally subject to a six-year statute of limitations, any "action to recover damages for malpractice, other than medical, dental or podiatric malpractice, *regardless of whether the underlying theory is based in contract or tort*" must be commenced within three years.  N.Y. C.P.L.R. § 214(6) (emphasis added).  In 1996, the New York legislature amended § 214(6) and added the emphasized clause above to ensure that "actions that were technically malpractice actions" could not be refashioned as breach of contract claims and afforded a six-year statute of limitations.  *Panteleone v. Envtl. Eng'g & Contracting*, No. 12-CV-5415, 2013 WL 3340483, at *3 (E.D.N.Y. July 2, 2013).[3]  Thus, where a breach of

---

[3] The New York legislature amended § 214(6) in response to a line of cases that applied a six-year statute of limitations to nonmedical malpractice claims based on breach of contract, with the intent to reduce potential liability of insurers and corresponding in malpractice premiums, and to restore "reasonable symmetry to the period in which all professionals would remain exposed to a malpractice suit."  *Chase Sci. Research, Inc. v. NIA Grp., Inc.*, 96 N.Y.2d 20, 27 (2001).

contract action is in fact "a malpractice action . . . grounded . . . on breach of contract to obtain a particular bargained-for result," § 214(6)'s three-year statute of limitations applies. *Chase*, 96 N.Y.2d at 25.

Here, Plaintiff alleges that MECC and LCS "breached the terms" of the relevant contracts "by failing to perform the[m]" as the agreements required: "'in a manner consistent with that level of care and skill ordinarily exercised by other professional consultants under similar circumstances at the time the Services are performed' and by failing to perform the ESA in accordance with ASTM Standard E 1527-05." (AC ¶¶ 172, 210 (quoting relevant agreements).) These allegations, claiming MECC and LCS failed to meet a professional standard of care that was a particular bargained-for result, are allegations of malpractice. Therefore, § 214(6)'s three-year statute of limitation applies to the breach of contract and professional malpractice claims as long as MECC or LCS are "professionals" under § 214(6). *See Chase*, 96 N.Y.2d at 25 ("When the Legislature amended C.P.L.R. § 214(6) . . . , it ended one quandary but exposed another: who are the 'professionals' whose misfeasance toward clients is subject to the shortened limitations period?")

In 2001, the New York Court of Appeals decided *Chase Scientific Research*, which defined the term "professional" for purposes of § 214(6). *Id.* at 29. It was guided by "[t]he qualities shared by such groups" as lawyers, doctors, architects, engineers, and accountants, which

> qualities include extensive formal learning and training, licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace *and* a system of discipline for violation of those standards. Additionally, a professional relationship is one of trust and confidence, carrying with it a duty to counsel and advise clients.

*Id.* at 29 (citations omitted) (emphasis added). Plaintiff argues that the use of the word "and" highlighted in the passage above means that every *Chase* factor must be met for someone to be deemed a "professional" under § 214(6). (Opp. to MECC at 8.) But such a reading was rejected in *Chase* itself, where the court implied that not every factor must be met by noting that extensive job training may suffice in lieu of formal education. *Chase*, 96 N.Y.2d at 30; *see Livingston v. En-Consultants, Inc.*, 981 N.Y.S.2d 556, 557 (App. Div. 2014) (decision whether defendant is professional under § 214(6) is "determined by reference to qualities that *include*" *Chase* factors) (emphasis added) (internal quotation marks omitted); *see also S. Wine & Spirits of Am., Inc. v. Impact Envtl. Eng'g, PLLC*, 962 N.Y.S. 2d 118, 119-20 (App. Div. 2013) (finding environmental consultants "professionals" for purposes of § 214(6) even though they were "not subject to licensing requirements"). By way of example, the *Chase* court explained that "engineers, architects, and accountants . . . face extensive work experience requirements" – twelve years for engineers and architects and fifteen years for accountants – which suffice to make those individuals professionals regardless of formal education or lack thereof. *Id.* Therefore, Plaintiff's argument that MECC and LCS are not professionals because they fail to meet every criterion laid out in *Chase* is rejected.

Here, it is instructive that Plaintiff hired MECC and LCS to complete the ESA and ESA review "in a manner consistent with that level of care and skill ordinarily exercised by other *professional* consultants," (AC Ex. A art. IV; *id.* Ex. E. art. IV (emphasis added)), and that the contracts "recognize[d] that professional standards and ethics govern" the services MECC and LCS were to provide, (*id.* Ex. A art. XV; *id.* Ex. E art. XV). It is further instructive that Plaintiff hired MECC and LCS so that Plaintiff could obtain "innocent landowner" status under CERCLA. (*Id.* ¶ 94.) To obtain "innocent landowner" status, Plaintiff had to hire

"Environmental Professionals," as defined by CERCLA, to conduct an environmental site assessment.  (*Id.* ¶ 95.)  While the *Chase* court made clear that deeming a defendant a professional in one context is not dispositive of whether that defendant is a professional under § 214(6), *Chase*, 96 N.Y.2d at 28, the CERCLA definition of "Environmental Professional" is illuminating here.

CERCLA defines an Environmental Professional as:

(1) a person who possesses sufficient specific education, training, and experience necessary to exercise professional judgment to develop opinions and conclusions regarding conditions indicative of releases or threatened releases [of hazardous substances] on, at, in, or to a property . . . .

(2) Such a person must:

(i) Hold a current Professional Engineer's or Professional Geologist's license or registration from a state, tribe, or U.S. territory (or the Commonwealth of Puerto Rico) and have the equivalent of three (3) years of full-time relevant experience; or

(ii) Be licensed or certified by the federal government, a state, tribe, or U.S. territory (or the Commonwealth of Puerto Rico) to perform environmental inquiries as defined in § 312.21 and have the equivalent of three (3) years of full-time relevant experience; or

(iii) Have a Baccalaureate or higher degree from an accredited institution of higher education in a discipline of engineering or science and the equivalent of five (5) years of full-time relevant experience; or

(iv) Have the equivalent of ten (10) years of full-time relevant experience.

40 C.F.R. § 312.10(b)(1)-(2).  Plaintiff concedes that MECC's and LCS's employees are "Environmental Professionals" because Charles G. Merritt, John Perotti, and Julie A. Daly all had at least ten years' relevant, full-time experience.  (AC ¶¶ 23, 96-99, 101.)  This is just the type of extensive, albeit informal, training contemplated by the New York Court of Appeals in *Chase*.  *See* 96 N.Y.2d at 30.

Further, Plaintiff's own allegations establish that its relationship with MECC and LCS was one of "trust and confidence," given that they were hired to "counsel and advise" Plaintiff,

and Plaintiff relied on their expertise.  *Id.* at 29; *see* AC ¶¶ 21, 93, 203, 219, 242.  In addition, in performing that duty, MECC and LCS were (according to Plaintiff) bound by applicable professional standards set forth by the ASTM.  (*See id.* ¶¶ 71, 89.)  I am also persuaded by MECC's argument that in providing advice regarding a property for loan underwriting purposes, an environmental consultant is performing a duty analogous to a real estate appraiser – a vocation that has been held to qualify as professional under § 214(6), *see F.D.I.C. v. Hoyle*, No. 10-CV-4245, 2012 WL 4049808, at *7 (E.D.N.Y. Aug. 2, 2012) ("Real estate appraisers have been considered professionals [under § 214(6)] by New York courts."); *Bank of Am., N.A. v. Column Fin., Inc.*, No. 10-CV-6378, 2013 WL 5231868, at *2 (S.D.N.Y. July 24, 2013) (finding that claim against real estate appraisers was subject to three-year statute of limitations, even though claim sounded in contract, because claimant alleged appraisers failed to conform to professional standards and federal guidelines).  For these reasons, other courts have found environmental consultants to be professionals under § 214(6), *see, e.g.*, *Panteleone*, 2013 WL 3340483, at *5 ("Environmental engineers and consultants of course fit [the *Chase* description."); *S. Wine & Spirits of Am., Inc.*, 962 N.Y.S.2d at 119-20 ("[P]ublic policy requires that [environmental consultant] should be held to a 'professional' standard of care . . . ."), and I agree.

Plaintiff's reliance on *Livingston* does not lead to a different result.  In *Livingston*, "[t]he defendant did not submit any evidence addressing the relevant factors to be considered in determining whether it is a professional within CPLR 214(6)."  981 N.Y.S.2d at 558 (internal quotation marks and alterations omitted).  Here, Plaintiff itself made factual assertions regarding the extensive work experience possessed by MECC's and LCS's employees, the regulations and

standards applicable to them, and the trust and confidence Plaintiff reposed in them by relying on their expertise.

Moreover, Plaintiff's cannot seek to hold MECC and LCS liable for failure to meet a professional standard of care while also attempting to avoid the truncated three-year statute of limitations for professional malpractice actions; that is exactly what the New York legislature intended to prevent when it amended § 214(6) in 1996. *See Panteleone*, 2013 WL 3340483, at *3-4. Further, "there is no rationale for subjecting professional malpractice by an architect, engineer, lawyer, or accountant to a statute of limitations over twice as long as that applied to doctors, dentists and podiatrists," N.Y. Bill Jacket, 1996 S.B. 7590, Ch. 623 (letter from N.Y. State Bar Association), and that same reasoning applies to an environmental consultant. Accordingly, both MECC and LCS are professionals under § 214(6), and Plaintiff's professional malpractice claims, as well as the breach of contract claims to the extent they seek relief because MECC and LCS failed to perform according to professional standards, are subject to a three-year statute of limitations.

### 2. Statute of Limitations for Negligent Misrepresentation

As stated above, claims for negligent misrepresentation are "subject to a three-year limitations period, unless the claim is grounded upon essential allegations of actual or constructive fraud, in which case the claim is governed by a six-year limitations period." *N.Y. State Workers' Comp. Bd.*, 67 N.Y.S.3d at 802. Plaintiff did not plead actual fraud but suggests it pleaded constructive fraud based on "'the existence of a fiduciary or confidential relationship between the parties.'" (Opp. to MECC at 24 (quoting *Reilly Green Mountain Platform Tennis v. Cortese*, No.12795/06, 2007 WL 7263362, at *11 (N.Y. Sup. Ct. Nov. 14, 2007)).) Plaintiff's only support for its constructive fraud claim in its motion papers is the single conclusory

sentence that "MECC had a special relationship with BankUnited because MECC and its staff held themselves out as 'Certified Environmental Specialists.'" (Opp. to MECC at 25.) First, Plaintiff has not cited authority for the proposition that a "special relationship," as opposed to a fiduciary or confidential relationship, is sufficient to plead constructive fraud in this context. *See Rescuecom Corp. v. Chumley*, No. 07-CV-690, 2011 WL 1204758, at *14 (N.D.N.Y. Mar. 28, 2011) (negligent misrepresentation claim requires fiduciary or confidential relationship). Second, even if a "special relationship" sufficed, Plaintiff cites no support for the notion that "Certified Environmental Specialists" are in a special relationship with their clients as to impose additional duties on them, and the Court could find no such support for such an assertion. Moreover, Plaintiff did not plead any allegation of actual or constructive fraud against LCS, and did not argue that it did in its opposition to LCS's motion to dismiss. In any event, the only misrepresentations alleged are the failure to uncover the conditions that Plaintiff alleges MECC and LCS would have found had they performed up to professional standards. (AC ¶¶ 199, 237). The negligent misrepresentation claim thus "stand[s] in the shadow of negligence" rather than in the "shadow of fraud." *Reilly*, 2007 WL 7263362, at *11. In the absence of any plausible claim of constructive fraud, the three-year statute of limitations applies to Plaintiff's negligent misrepresentation claims.

### 3. When Plaintiff's Claims Against MECC and LCS Accrued

Plaintiff argues that even if its claims are subject to a three-year statute of limitations, these claims did not accrue until it discovered the radioactive condition on the Premises, or, alternatively, that the statute of limitations did not begin to run until Plaintiff suffered damages, which it alleges was when the contamination became public through the 2015 EPA report or 2016 news articles reporting on the conditions of the premises.

Professional malpractice claims, including those that sound in contract, accrue "when the malpractice is committed, not when the client discovers it."  *Williamson v. PricewaterhouesCoopers LLP*, 9 N.Y.3d 1, 7-8 (2007).  Plaintiff argues, however, that N.Y. C.P.L.R. § 214-c tolled the statute of limitations until Plaintiff learned of its injury.  Secion 214-c provides that claims

> to recover damages for personal injury or injury to property caused by the latent effects of exposure to any substance or combination of substances . . . shall be computed from the date of discovery of the injury by the plaintiff or from the date when through the exercise of reasonable diligence such injury should have been discovered by the plaintiff, whichever is earlier.

N.Y. C.P.L.R. § 214-c.2.  Plaintiff's claims do not fall within § 214-c's sweep.

Even assuming Plaintiff alleges injury to property, which it does not, § 214-c does not apply to Plaintiff's claims.  As the New York Court of Appeals has explained, "remedial statutes," like § 214-c, "must be given a meaning consistent with the words chosen by the Legislature."  *Germantown Cent. Sch. Dist. v. Clark, Clark, Millis & Gilson, AIA*, 100 N.Y.2d 202, 206 (2003).  Section 214-c allows plaintiffs to recover "for exposure-induced injuries that do not have a perceptible effect until many years after exposure," N.Y. C.P.L.R. § 214-c(2), and therefore the discovery rule applies only when the claimed injury was "*caused by the latent effects of exposure* to a toxic substance," *Germantown*, 100 N.Y.2d at 202 (emphasis in original) (quoting N.Y. C.P.L.R. § 214-c(2)g).

Here, Plaintiff has alleged no injury as a result of *latent* effects of radioactive exposure.  The alleged "latent radioactive matter" was present on the Premises when Plaintiff took a security interest in it just as it was when Plaintiff discovered the condition, and Plaintiff does not and cannot plead any injury caused by *exposure*.  *See Germantown Cent. Sch. Dist. v. Clark,*

*Clark, Millis & Gilson, AIA*, 743 N.Y.S.2d 599, 603 (App. Div. 2002) (section 214-c does not

apply where contamination was "complete" and "no further or additional damage to the building

(or to individuals) is alleged" when plaintiff took possession of the property unless there are

allegations of continued, "gradual contamination" whereby the exposure becomes more

dangerous over time), *aff'd* 100 N.Y.2d 202. Plaintiff alleges that it could not have discovered

its injury before June 2015, when the EPA met with the Borrower, (Opp. to MECC at 22; Opp. to

LCS at 22), but that is irrelevant. The contaminants had been present for decades and Plaintiff

does not allege that they became more dangerous over time. Because Plaintiff does not plead a

latent, exposure-induced harm, the discovery rule of § 214-c does not apply, and there is no

ground to adjust the accrual date of Plaintiff's claims.

ii.       *Actual Injury*

Plaintiff next argues that the statute of limitations on its claims did not start to run until it

sustained an actual injury when the Premises was rendered worthless, which Plaintiff alleges is

no earlier than 2015 when the EPA investigated the property and discovered the contamination.

(Opp. to MECC at 22-24, Opp. to LCS at 23-24.) To support its assertion, Plaintiff relies on

*Kerbein v. Hutchison*, 816 N.Y.S.2d 591 (App. Div. 2006). *Kerbein*, however, supports

MECC's and LCS's positions that the statute of limitations began to run no later than March 20,

2014, when Plaintiff closed on its mortgage loan with the Borrower.

In *Kerbein*, the plaintiff brought a legal malpractice claim against the defendants for

erroneous advice regarding the tax consequences of a settlement agreement. *See id.* at 591. The

court found that the claim did not accrue when the malpractice was committed, but instead

accrued once the settlement agreement was entered into, because that was when the plaintiff

detrimentally relied on the faulty advice. *Id.* at 592. The court reasoned that a claim cannot

accrue until "all the facts necessary to the cause of action have occurred and an injured party can obtain relief in court," and that the plaintiff's injury became actionable not when she discovered that she had suffered damages (in her case, through action by the IRS the following year), but when she became bound by the settlement.  *Id.* (quoting *Ackerman v Price Waterhouse*, 84 N.Y.2d 535, 541 (1994)).  The statute of limitations in *Kerbein* did not begin to run until the settlement agreement was finalized because prior to that, the plaintiff could have walked away from settlement and suffered no damages.  Here, however, Plaintiff has alleged no facts to suggest that it could have walked away from the deal between the time that it closed on the mortgage loan and the time when it learned of the contamination.  As in *Kerbein*, at the time of closing Plaintiff could have brought all of the claims against MECC and LCS that it brought in the instant action, because, as alleged by Plaintiff, MECC and LCS had already failed to perform under the contract, committed professional malpractice, and negligently omitted any reference to nuclear or radioactive materials on the premises in the ESA and ESA review.  (*See id.* ¶¶ 68-69, 91.)  Any claim Plaintiff brought after learning of the contamination was actionable at closing, and it does not matter that Plaintiff did not discover its damages until later.  Thus, Plaintiff could obtain relief in court beginning no later than March 20, 2014.

Because Plaintiff's breach of contract, professional malpractice, and negligent misrepresentation claims accrued by March 20, 2014, they are time-barred as this action was commenced on July 13, 2017, more than three years later.[4]  Accordingly, Plaintiff's second,

---

[4] Even if Plaintiff's negligent misrepresentation claims and portions of its breach of contract claims were not time-barred, they would still be dismissed as duplicative of Plaintiff's professional malpractice claim.  *See Paladini v. Capossela, Cohen, LLC*, No. 11-CV-2252, 2012 WL 3834655, at *5 (S.D.N.Y. Aug. 15, 2012) ("Redundant claims for, *e.g.*, breach of contract and breach of fiduciary duty, which are predicated on the same allegations and seek relief identical to that sought in a malpractice cause of action must be dismissed as duplicative.") (alterations and internal quotation marks omitted), *aff'd*, 515 F. App'x 63 (2d Cir. 2013)

third, fifth, and sixth causes of action are dismissed in their entirety, and Plaintiff's first and

fourth causes of action are dismissed to the extent that they are premised on MECC's and LCS's

respective failures to conform to a professional standard of care as required by the contracts.[5]

### B. Breach of Contract for Failure to Procure Insurance

Plaintiff alleges that, beyond breaching their contractual duties for failure to perform with

the level of care and skill ordinarily exercised by other professional consultants, MECC and LCS

breached their contractual duties to maintain "Comprehensive General Liability" insurance.

(Opp. to MECC at 17-18; Opp. to LCS at 18-19.)  Both MECC and LCS argue that they did

procure the requisite insurance and that they should not be held liable simply because the

insurance companies refused to cover Plaintiff's claims.  (MECC Mem. at 21; LCS Mem. at 12.)

In light of my dismissal of the claims against MECC and LCS directly, Plaintiff fails to

plausibly allege any damages suffered as a result of their alleged failure to procure insurance,

and for that reason, its claims must be dismissed.  Plaintiff argues that it "bargained for insurance

to cover precisely what occurred here, *i.e.*, damages flowing from MECC's failure to perform,"

---

(summary order); *Conklin v. Owen*, 900 N.Y.S.2d 118, 120 (App. Div. 2010) (dismissing claim for negligent representation as duplicative of malpractice claim); *see also Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 376-77 (S.D.N.Y. 2004) (breach of contract claim for failure to "provide professionally competent services and to exercise applicable standards of care, loyalty and honesty" dismissed as duplicative), *amended on other grounds on reconsideration*, No. 03-CV-6942, 2004 WL 2403911 (S.D.N.Y. Oct. 26, 2004); *Shaya B. Pac., LLC v. Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, 827 N.Y.S.2d 231, 238 (App. Div. 2006) (affirming dismissal of breach of contract claim as duplicative of malpractice claim).

[5] This court is sympathetic to the fact that Plaintiff did not learn of the contamination until after it closed on the mortgage and that it would have learned of it had it not been for MECC's and LCS's alleged professional malpractice.  In some instances, plaintiffs may be foreclosed from bringing claims against environmental consultants who commit malpractice because the plaintiffs do not learn of the contamination until more than three years later.  But this is not one of those instances.  Plaintiff admits that it was advised of the contamination on November 16, 2015, (AC ¶ 61), well within three years of closing on the mortgage (and even of delivery of the ESAs).  Plaintiff had more than a year to bring a timely claim but failed to do so.

which left Plaintiff "completely uninsured for the very loss it has sustained, namely the four to thirty million dollar remediation required on the Premises, rendering BankUnited's mortgage interest worthless." (Opp. to MECC at 19.) But damages in a breach of contract claim for failure to procure insurance are "limited to that which would have been borne by the insurer had the policy been in force." *Structural Bldg. Prod. Corp. v. Bus. Ins. Agency, Inc.*, 722 N.Y.S.2d 559, 562 (App. Div. 2001) (internal quotation marks omitted). Without any cognizable claims against MECC or LCS, there are no damages that an insurance company would be liable to cover. *See Moslem v. Parietti & McGuire Ins. Agency*, 2011 WL 721653, at *3 (S.D.N.Y. Feb. 24, 2011) ("even assuming that defendants" are at fault for failing to procure insurance, "and, thus, were required to pay the plaintiff what [it] would have received from [its] insurance company had the requested insurance policy been issued, they would not have to pay the plaintiff any damages, as the plaintiff's insurable interest under that policy would have been extinguished."). "[U]nder the typical liability insurance policy, an insurer must reimburse the insured only as to amounts which the insured 'shall become legally obligated to pay as damages.'" *Freeman v. Schmidt Real Estate & Ins.*, 755 F.2d 135, 137 (8th Cir. 1985); *see* AC ¶¶ 248, 255, 270, 286, 293, 308 (policies cover damages the insured becomes "legally obligated" to pay). Therefore, even if MECC and LCS had obtained the policies Plaintiff alleges should have been procured, the insurer would have no obligation to pay Plaintiff anything because all of Plaintiff's claims are time-barred.

Accordingly, Plaintiff has failed to plead damages, "an essential element of a breach of contract claim," and its breach of contract claims against MECC and LCS for failure to procure insurance are dismissed. *Zamora v. Morphix Co., Ltd*, No. 15-CV-6532, 2017 WL 95220, at *5 n.5 (S.D.N.Y. Jan. 10, 2017).

### C. Declaratory Claims Against Insurance Providers

Plaintiff seeks judgment declaring that Defendants Great Divide, Beazley, and Crum (collectively, "the Insurance Defendants") must indemnify Plaintiff under the various insurance policies. (AC ¶¶ 265, 278, 281, 303, 316). In their motion papers, the Insurance Defendants and Plaintiff discuss the applicability of various exclusions and clauses, but they do not address whether Plaintiff's claims against the Insurance Defendants could survive if all of the claims against MECC and LCS were dismissed. This Court cannot discern any cause of action that remains as to the Insurance Defendants absent viable claims against MECC or LCS, given that Plaintiff's seventh through eleventh causes of action each seek relief from the Insurance Defendants "if MECC is found liable" or "if LCS is found liable." (*Id.* ¶¶ 265, 278, 281, 303, 316.)

Accordingly, I need not address the issues debated by the parties, and I will dismiss the claims against the Insurance Defendants unless Plaintiff shows cause, by letter of no more than three pages, on or before January 3, 2019, why those claims should survive. Should Plaintiff do so, Great Divide, Beazley, and Crum may respond by letter of no more than three pages by January 10, 2019.

## IV. LEAVE TO AMEND

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended once, (Doc. 29), after having the benefit of pre-motion letters from MECC, LCS, and Great Divide, (Docs. 20, 22, 25), as well as the Court's observations during a pre-motion conference, (Minute Entry dated Oct. 16, 2017). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. *See Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories *seriatim*.") (alteration, footnotes, and internal quotation marks omitted); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, Plaintiff has not asked to amend or suggested that it is in possession of facts that would cure the deficiencies identified in this opinion. Indeed, the issues with Plaintiff's AC are

substantive, so better pleading would not help Plaintiff here. *See Cuoco v Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Accordingly, the Court declines to grant leave to amend *sua sponte*. *See TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint); *Gallop*, 642 F.3d at 369 (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (denial of leave to amend would be proper where "request gives no clue as to how the complaint's defects would be cured") (internal quotation marks omitted).

## V.    CONCLUSION

For the foregoing reasons, MECC's and LCS's motions to dismiss are GRANTED, and Great Divide's, Beazley's, and Crum's motions are held in abeyance pending the correspondence described above. The Clerk of Court is respectfully directed to terminate MECC's and LCS's motions. (Docs 76, 81).

**SO ORDERED.**

Dated: December 20, 2018
       White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.